Williams agt. Western Union Telegraph Company.

## N. Y. SUPERIOR COURT.

WILLIAM S. WILLIAMS agt. THE WESTERN UNION TELEGRAPH COMPANY and others.

*Corporations — Stock companies — their right to issue stock for their surplus earnings — Such issuing not prohibited by the laws of this state — Injunction — When increase of capital stock not against public policy — What is not deemed a watering of stock of a corporation — Telegraph companies.*

Although the amount of property belonging to a corporation is one of, the considerations which enters into the market value of its shares, yet such market value also embraces other essential elements. It is the estimate put on the potentiality of a corporation to avail itself profitably of its franchise, on its capacity and on the mode in which it uses its privileges as a corporate body, which materially influences and often controls its market value.

The difference between the actual value and the sum paid by the Western Union Telegraph Company for the property of the American Union and the Atlantic and Pacific Telegraph Company (if any) is not so great as to authorize finding that the agreement was fraudulent and therefore should be set aside on that ground alone.

A corporation organized under the laws of the state of New York is authorized by these laws to issue scrip dividend to represent its surplus earnings.

The action of the Western Union Telegraph Company in issuing certificates of stock to the amount of $15,526,590 is not prohibited by the statute (2 *R. S.* [*6th ed.*], 398).

The meaning of the words "capital stock" as used in this statute means the property and franchises of the company, and the statute itself means that no corporation shall divide among its shareholders any portion of "the property and franchises of the company."

The capital stock of a corporation mentioned in its charter is not *per se* a limitation of the amount of property, either real or personal, which it may own. It may divide its profits among the stockholders at such times and to such amounts as the directors may deem expedient. Instead of dividing the profits, they may, in their discretion, permit the surplus of property to accumulate beyond their original capital, as the interest of the corporation shall appear to dictate; and the corporation has, in the manner provided by law, a right to increase the number of certificates which represent the interest its stockholders have in its corporate fund. Such transaction is neither in law nor in fact a watering of the stock of a corporation.

Chapter 399 of the Laws of 1875 provides the manner in which a company organized under the laws providing for the incorporation of telegraph companies can increase the number of shares of its capital stock:

*Held,* that the Western Union Telegraph Company has complied with the requirements of this law. It has published the notice as required, and has obtained the written consent of the shareholders owning and holding three-fourths in amount of its capital stock.

*Held,* also, that this increase of capital stock, authorized as it is by the laws of this state, is not against public policy, because the law-making power of the state has allowed it.

*Special Term, June,* 1881.

TRUAX, *J.* — I have found, as a matter of fact, that the defendants Jay Gould, Russel Sage and Thomas T. Eckert did not enter into an unlawful combination or agreement with divers persons connected with the Atlantic and Pacific Telegraph Company, the Western Union Telegraph Company and with the American Union Telegraph Company for the purpose of uniting together large amounts of capital and for the purpose of depressing the stocks of the several telegraph companies in the market, in order that they might get control of the then companies after the holders of the stock of said companies had been frightened into the belief that a "telegraph war" was impending, and had sold their stock. I have also found that the other allegations of fraud and conspiracy made in the complaint against the said defendants and others were not proved on the trial. One of the very able counsel for the plaintiff, in his argument at the close of the trial of this case, said that he was not going to lament the fact that he had failed to show such a combination — that he had not been able to prove certain things by the defendant.

I have also found that the property of the American Union was worth $15,000,000 and that of the Atlantic and Pacific $8,400,000. The plaintiff alleges in his complaint that the real value of the property of these two companies does not exceed the sum of $8,000,000, and to prove that allegation called,

among others, Mr. Eckert, Dr. Green, Mr. Bates, Mr. Shivler, Mr. Van Horne, Mr. Sanford and Mr. Shaffner. Mr. Shaffner could not say whether he was or was not an expert in determining the cost of the construction of telegraph lines, but said he could tell pretty well what a line would cost if he knew the market price of the materials. I have endeavored to ascertain from his testimony what the value of the property of the American Union was, and I have come to the conclusion that this witness would have fixed the value, if he had named it, at about four to six millions of dollars. Mr. Sanford thought the poles and wires could be put up for $7,000,000, while Gen. Eckert testified that on the 19th day of January, 1881, it would have cost about $10,000,000 "to build a set of telegraph lines, plant and other appurtenances to the telegraph business of the extent and capacity of those possessed by the American Union and sold to the Western Union;" and that now it would cost more because materials and labor are higher. In this he is corroborated by Mr. Shivler. Gen. Eckert said that he considered the property of the American Union to be worth $20,000,000, and that he estimated its value from the earning capacity of the property. Besides this, the American Union had a great many valuable contracts with said roads, which it would have been impossible, in January, 1881, to replace or reproduce.

In the case of the *Commonwealth* agt. *The Hamilton Manufacturing Company* (12 *Allen*, 302) chief justice BIGELOW says: "Undoubtedly the amount of property belonging to a corporation is one of the considerations which enters into the market value of its shares, but such market value also embraces other essential elements. It is not made up solely by the valuation or estimate which may be put on the corporate property, but it also includes the profits and gains which have attended its operations, the prospect of its future success, the nature and extent of its corporate rights and privileges and the skill and ability with which its business is managed. In other words, it is the estimate put on the potentiality

Williams agt. Western Union Telegraph Company.

of a corporation to avail itself profitably of its franchise, on its capacity and on the mode in which it uses its privileges as a corporate body, which materially influences and often controls its market value."

I think the evidence warrants the conclusion that the property of these two companies was worth the sum paid for it by the Western Union. At any rate, the difference between the actual value and the sum paid — the inadequacy of price was not so great that I would be authorized in finding that the agreement was fraudulent, and, therefore, should be set aside on that ground alone (2 *Kent's Com.*, 477 ; 1 *Parsons on Cont.*, 492, *and cases there cited*).

I have also found that the scrip dividend of $15,526,590 represents surplus earnings of the Western Union Telegraph Company, made since the 1st day of July,. 1866, which had, by and° with the consent of the stockholders of said company, been invested, from time to time, in property necessary and useful in and about the business of said company ; that said property was in the possession of the company on the 19th day of January, 1881, and that said property was then worth the sum of $15,526,590.

The question then arises, upon these findings : Is a corporation organized under the laws of the State of New York, authorized by these laws to issue scrip dividends to represent its surplus earnings, which have from time to time been used to purchase new plant — or rather, is it prohibited by the laws of the State of New York from so doing ?

I have held, as a matter of law, that the laws of the State of New York do authorize the Western Union Telegraph Company to issue stock for this $15,526,590 surplus earnings. The plaintiff contends that such issuing of stock is prohibited by the laws of this State, and calls the attention of the court to the following portion of the Revised Statutes : " It shall not be lawful for the directors or managers of any incorporated company in this State to make dividends excepting from the surplus profits arising from the business of such

corporation; and it shall not be lawful for the directors of any such company to divide, withdraw or in any way pay to the stockholders, or any of them, any part of the capital stock of such company, or to reduce the capital stock without the consent of the legislature" (2 *Rev. Stat.* [*6th ed.*], 308).

If the defendant, the Western Union Telegraph Company, has divided any portion of its capital stock among its stockholders, it comes within the statute, and the plaintiff is entitled to maintain the injunction already issued.

What is the meaning of the words "capital stock" in the statute above cited? The capital stock is not only the money put into the corporate fund; it is also the property put into that fund. It is to be distinguished from the certificates issued by the corporation usually called stock certificates, which are simply the written evidence of the holder's right to participate in the surplus profits of the corporation during its existence, in the proportion that the shares held by him bear to the whole number of shares into which the corporate property is divided; and on the dissolution of the corporation to participate in the same proportion in the division of the corporate property, after the payment of the debts of the corporation (*Hyatt* agt. *Allen*, 55 *N. Y.*, 553; *Jones* agt. *Terre Haute R. R. Co.*, 57 *N. Y.*, 196; *Burrall* agt. *Bushwick R. R. Co.*, 75 *N. Y.*, 216; *Pierce on Railroads* [2 *ed.*], 110).

A holder of such a certificate acquires no right to take away any portion of the corporate property (75 *N. Y.*, 216). The corporate property — the "capital stock" of a corporation — is not divided or withdrawn or reduced by the issuing of such certificates. The corporate fund — the capital stock — still remains the same. "The word stock," said the court of appeals, in *Burr* agt. *Wilcox* (22 *N. Y.*, 551), "has various significations, but as applied to joint-stock associations it means the property and franchises of the company. It is sometimes used to designate the certificate or scrip issued to the stockholder; but this is an inappropriate use of the word. The scrip is not the stock."

Williams agt. Western Union Telegraph Company.

I am of the opinion that the statute means that no corporation shall divide among its shareholders any portion of "the property and franchises of the company," and that the action of the defendant — the Western Union Telegraph Company — in issuing the said $15,526,590 of certificates of stock, of which action the plaintiff complains, is not prohibited by the statute above quoted.

The defendant contends that the increase of the capital stock of the Western Union to $80,000,000 was authorized by chapter 319 of the Laws of 1875. The plaintiff contends that when under that act an addition is made to the capital it must be paid for, and that unless legislative authority is given to issue stock for a consideration other than money, it must be paid for in money or money's worth. I have held, as matter of fact, that this $15,526,590 of stock was issued for a valuable consideration, and that it had been paid for with $15,526,590 of property. It is the law in this state that in the absence of any statutory restriction a corporation has power to waive payment otherwise than in money for subscription to the capital stock ·(*East N. Y., &c., R. R. Co.* agt. *Lighthull,* 5 *Abb.* [*N. S.*], 458).

This is one of the common-law powers of a corporation. "Such common-law powers," said the general term of this court in the case cited above, "are the same as those possessed by individuals, unless restricted by some pointed or clearly implied prohibition of law" (*Barry* agt. *Merchants' Exchange Co.,* 1 *Sandf. Ch.,* 580; *De Graff* agt. *Am. Linen Thread Co.,* 21 *N. Y.,* 124).

And the objection that an act of corporation is *ultra vires* rests upon the absence of either express or implied power, and not upon the wrong use of it. In the case of *Barry* agt. *Merchants' Exchange Company,* it was held that the capital stock of a corporation mentioned in its charter is not *per se* a limitation of the amount of property, either real or personal, which it may own. It may divide its profits among the stockholders at such times and to such amount as the directors may deem expedient.

Instead of dividing the profits they may, in their discretion, permit the surplus of property to accumulate beyond their original capital, as the interest of the corporation shall appear to dictate. It seems to me, then, that if a corporation has a right to allow its corporate fund, its capital stock, to increase beyond the limit fixed for its capitalization by its charter, it has, in the manner provided by law, a right to increase the number of certificates which represent the interest its stockholders have in its corporate fund. I do not mean to be understood as saying that a corporation has a legal right to issue certificates of stock beyond the value of its corporate property — in other words, that a corporation has a right to "water" its stock. I do not pass upon that question. I have held, as matter of fact, that the Western Union Telegraph Company has not watered its stock. It was proved on the trial of this action that money earned by the said company, and which was the profits of the business of the company, and as such was available for the purpose of dividends, had been used by the company in purchasing new permanent assets for which no stock had been issued. It is not an unusual thing for corporations to allow a surplus to accumulate and to be held by the corporation either in money or other property until, in course of time, certificates of capital stock are issued to the stockholders to represent their interest in these accumulations. Such a transaction is neither in law nor in fact a watering of the stock of a corporation. For the certificates of stock the corporation holds either the money or the property to the full amount of the certificates issued, and it falls neither within the spirit nor the letter of the law, if there be such a law, against the inflation of the capital stock of a corporation like the Western Union Company. The true test of the transaction is, has the money of the stockholders, to the amount represented by the proposed issue of certificates, been retained, and is it held by the company, either in money or in property? If so, it is proper that the interest of the stockholder in such accumulation should be represented in his hand by

certificates of stock. Courts have frequently been called upon to determine whether such accumulations belong, when they come to be divided, to the stockholders of record at the time the accumulations were made, or to the stockholders at the time of making the division. It is now well settled that a shareholder in a corporation has no legal title to its accumulated profits until they are divided, and when divided they go to their shareholders (*Hyatt* agt. *Allen*, 55 *N. Y.*, 553; *Jones* agt. *The Terre Haute R. R. Co.*, 57 *N. Y.*, 196).

Incident to the ownership of stock in a corporation, and passing with the assignment of shares thereof, is the right to receive the proportional share of all the profits not divided at the time of the purchase of the shares, and it is immaterial at what time and from what sources these profits have been earned.

I have therefore reached the conclusion that the proposed issue of new stock, upon the evidence in this case, does not come within the spirit or the letter of the law against watering stocks, if there be such a law. Within the past quarter of a century a great many corporations have watered their stock, and such transactions have frequently been before the courts of this and other states; and the able counsel for the plaintiff have not found any case in which the court has, in express terms, expressed its disapproval of such a transaction. There are, on the other hand, cases in which the courts have approved "the issue of dividends of stock where there were not earnings properly applicable for the purposes of a dividend in cash, and it was deemed expedient to retain the amount in order to make permanent improvements or to pay debts." I quote the language of Pierce on the Law of Railroads (*page* 123), a recognized authority. The question was also decided by a judge of the supreme court of this state in *Howell* agt. *Chicago and N. W. R. R. Co.* (51 *Barb.*, 378).

There are also numerous cases in which the question has been collaterally before the courts, and in no instance have the courts denied the right of corporations to issue an increased amount of stock to represent accumulations. Dividends of

stock have been issued to pay interest on stock (*Ohio City* agt. *Cleveland and T. R. Co.*, 6 *Ohio St.*, 489). "Whatever disposition was made?" (of such a distribution of stock) said the general term of the supreme court in *Miller* agt. *Illinois Cent. R. R. Co.* (24 *Barb.*, 331), " whatever disposition was made of it the stockholders get the benefit of it directly or indirectly" (*See, also, Jones* agt. *The Terre Haute R. R. Co.*, 57 *N. Y.*, 196 ; *State* agt. *Baltimore and Ohio R. R. Co.*, 6 *Gill*, 363 ; *Boston and L. R. R. Co.* agt. *Commonwealth*, 100 *Mass.*, 399).

Chapter 399 of the Laws of 1875 provides the manner in which a company organized under the laws providing for the incorporation of telegraph companies can increase the number of shares of its capital stock. It says : "It shall be lawful for any association of persons organized under this act, by their articles of association to provide for an increase of their capital, and the number of shares of the capital stock of the association ; but if any such association shall have omitted to so provide for an increase of their capital, it shall be lawful, after notice of the intention so to do, published once a week for six weeks successively in the state paper, and in any newspaper of general circulation published in the county where the principal office of such company is located, and with the written consent of shareholders holding and owning three-fourths in amount of the then capital·to provide for an increase thereof and the number of shares into which the same shall be divided." The articles of association of the Western Union Telegraph Company, although they were before chief judge SEDGWICK and judge SPEIR, were not offered in evidence on the trial of this action.. In the absence of evidence to the contrary a corporation will be presumed to have acted in conformity with its corporate powers· (*Chautauqua County Bank*·agt. *Risley*, 19 *N. Y.*, 369 ; *De Graff* agt. *American Linen Thread Co.*, 21 *N. Y.*, 124).

The Western Union Telegraph Company has complied with the requirements of this law. It has published the notice as required, and has obtained the written consent of the share-

holders owning and holding three-fourths in amount of its capital stock.

I am also of the opinion that this increase of capital stock, authorized, as it is, by the laws of this state, is not against public policy. It may be against the public good but it cannot be against the public policy, or, as it is sometimes called, the policy of the law, because the law-making power of the state has allowed it. Courts, since the time of Henry V, have held that contracts in restraint of trade are against public policy. Such contracts are neither expressly nor impliedly authorized by statute, yet if the legislature should declare that hereafter no such contract should be considered to be against public policy, such a contract would not be against public policy. It is within the power of the legislature to say what is and what is not against public policy, and having said it, it is the duty of the courts " to declare the law and not to make law."

Holding as I do upon the main question in this action, I do not consider it worth while to discuss whether the plaintiff is a " litigious volunteer," whether he is " making improper use of the process of the court," whether the fact that the agreement of January nineteen has been executed, or whether the plaintiff has acquiesced in the agreement is a defense to the action.

Judgment for the defendant is ordered, with costs.